43346. WOODS v. THE STATE.
43491. ROGERS v. THE STATE.

ARGUED JANUARY 15 AND FEBRUARY 7, 1968—DECIDED
MARCH 20, 1968—REHEARING DENIED MARCH 29, 1968.

*Howard Moore, Jr., Peter E. Rindskopf, Edward W. Jacko, C. B. King,* for appellants.

*Lewis R. Slaton, Solicitor General, J. Roger Thompson, J. Walter LeCraw,* for appellee.

JORDAN, Presiding Judge. ■ The transfer of these appeals to this court by the Supreme Court is conclusive as to jurisdiction, and this court is limited in the consideration of State or Federal constitutional issues, with exceptions not here applicable, to the mere application of unquestioned and unambiguous provisions. *Code Ann.* §§ 2-3704, 2-3708; *Woods v. State,* 223 Ga. 754 (158 SE2d 395), and cases cited therein.

■ The main question confronting the court in these cases is whether or not the method of selection of the grand and traverse juries which indicted and tried these defendants resulted in the discriminatory exclusion of certain identifiable groups within the community. The appellants, Negroes and adherents of the Black Muslim or Islam faith, timely raised this issue by a motion to quash the indictment and a challenge to the array of

traverse jurors, relying on the holdings in Whitus v. Georgia, 385 U. S. 545 (87 SC 643, 17 LE2d 599), and Vanleeward v. Rutledge, 369 F2d 584 (5th Cir.). Error is enumerated on the overruling of the motion and the challenge after hearing thereon by the trial court.

This question must be examined in the light of the holdings in Whitus and Vanleeward, supra. In the Whitus case, decided on January 23, 1967, the United States Supreme Court had before it the method of selection of jurors in Mitchell County under former *Code Ann.* § 59-106[1] and after pointing out from the evidence how it was possible for the commissioners to determine whether a taxpayer was white or Negro, held that "Under such a system the opportunity for discrimination was present and we cannot say on this record that it was not resorted to by the commissioners. Indeed, the disparity between the percentage of Negroes on the tax digest (27.1%) and that of the grand jury venire (9.1%) and the petit jury venire (7.8%) strongly points to this conclusion. Although the system of selection used here had been specifically condemned by the Court of Appeals, the State offered no testimony as to why it was continued on retrial. The State offered no explanation for the disparity between the percentage of Negroes on the tax digest and those on the venires, although the digest must have included the names of large numbers of 'upright and intelligent' Negroes as the statutory qualification required. In any event the State failed to offer any testimony indicating that the 27.1% of Negroes on the tax digest were not fully qualified. The State, therefore, failed to meet the burden of rebutting the petitioners' prima facie case." P. 552.

In the Vanleeward case, decided on December 6, 1966, the Court of Appeals for the Fifth Circuit had before it the method of jury selection in Muscogee County under former *Code Ann.*

---

[1] Responding to the criticism in the Whitus case the General Assembly of Georgia by an Act approved March 30, 1967, superseded *Code Ann.* § 59-106 so as to provide, among other things, that the jury commissioners in composing jury lists "shall select a fairly representative cross-section of the upright and intelligent citizens of the county from the official registered voters' list" in lieu of the taxpayers' list used under the old law.

§ 59-106, and the court (Chief Judge Tuttle, p. 586) stated: "[I]t is at once obvious that the tremendous disparity between the Negro percentage of population 21 years and older (30%) and the Negro percentage of persons on the tax digests (14%) on the one hand and the percentage of Negroes on this jury list of 3,470 names (.75%) is so great as to condemn the system that produces such a list. It is not necessary to determine that any of the commissioners, consciously or intentionally, failed to carry out the duties of their office, to conclude that the jury list from which the panel that tried Vanleeward was selected was totally defective."

The grand jury which indicted the defendants on March 10, 1967, was drawn on February 3, 1967, both dates subsequent to the Whitus decision. We assume, without deciding, that a system could be followed under former *Code Ann.* § 59-106 which would avoid the result reached and condemned in the Whitus and Vanleeward cases. The burden of making a prima facie case was upon the defendants on the hearing of their motion and challenge. However, the solicitor general at the outset stated to the court that "if it [the motion to quash] is based on the Whitus case, if the court please, I believe that the State should assume the burden of getting around the prima facie case as made by the Whitus case and I think it is binding on the State of Georgia to go into evidence as to why we contend that our county does not follow under the Whitus case." The solicitor then produced two members of the jury commission, one of whom is white and the other Negro, and their testimony is generally consistent. This evidence shows a jury commission of six members appointed for staggered terms of six years, then consisting of five white members and one Negro member. In preparing the lists the commission started out by working directly from the tax records, but by court direction abandoned this procedure and commenced anew. Under the revised procedure questionnaires were sent as a matter of routine to all persons listed on the tax records and not obviously disqualified for jury service, and the commission selected names upon the examination of the returned questionnaires without reference to the tax records. The questionnaire, described by the testimony

in both cases and shown as an exhibit with the transcript in Rogers' case, contains questions as to place of birth, age, residence, citizenship, type and length of employment, criminal record, physical impairment preventing jury service, marital status, education, views on capital punishment, and ownership of real property, but nothing whatsoever to indicate directly race or color. All returned questionnaires were checked as a matter of course in the police department to eliminate those with disqualifying criminal records.

The white commissioner testified that the other commissioners would seek his opinion about persons who lived in the section of the county where he lived, and he did the same thing in respect to them. He referred names he thought to be Negroes to the Negro commissioner and this commissioner "accepted them or rejected them as having known them." The white commissioner also stated that "we took into consideration the over-all questionnaire, if he made out a good form and answered the questions intelligently, all of that, why, there was no discrimination against him." After commencing the new procedure he did not refer to the tax records, and he did not see anyone else refer to them. In his experience he had observed many Negroes serving as jurors in Fulton County.

The Negro commissioner emphasized that the original procedure made it easy to identify race, as between white on white slips and Negro, as he recalled, on pink slips, but that the new questionnaire procedure completely eliminated this. In answer to a specific question as to race as a factor in selection, he answered, "Just to me, as far as I am concerned, I am quite sure that didn't play a factor, not at all." In his opinion he observed nothing on the part of others using race as a factor in selection. Other commissioners who thought this witness knew a person would ask him to examine a questionnaire. As he recalled, out of about 190,000 questionnaires sent out, some 75,000 or 80,000 were returned, and the commissioners selected 36,000 plus as potential petit jurors and around 3,500 as potential grand jurors. The tax records, which were not used under the new procedure, remained in the room where the commissioners worked, but he could recall no particular function these

records served under the new procedure. He could not testify whether any other commissioners referred to these documents. This witness conceded that stability of employment did enter into considerations, and that because there were many Negroes of the laboring class, there would be some chance of discrimination. He understood it was the duty of the commission to select all Negroes who could qualify, but he never heard it "expressed or spelled out" in terms of a quota. He had no idea how many Negroes were on the jury lists. From time to time the other commissioners sought his opinion about someone believed to be a Negro, perhaps some 10 or 12 times during a session.

The evidence offered by the prosecutor as set forth above shows a laudable, determined, and conscientious effort to avoid any discrimination, and was at least sufficient to shift the burden of going forward with the evidence back to the defendants.

After the jury commissioners' testimony the trial judge stated to defendant's counsel, "I am going to overrule your motion . . . . I have heard all the evidence I need to hear." Despite an offer by defendant's counsel to offer proof at this point, the trial judge took the unequivocal position that he had heard enough evidence to make the rulings, and thus eliminated from his own consideration, and likewise from the record before this court, that evidence which would be essential to a proper determination of any issue of discrimination in jury selection. By this ruling the defendants were precluded from going forward with their burden of showing a discriminatory result, if indeed such could be shown by the statistical results of the system used by the commissioners.

In the face of the Whitus and Vanleeward decisions, the evidence in the record is insufficient in that it fails to show the final result of the work of the jury commission in terms of the proportion of Negroes actually selected for the jury lists, and then selected from such lists for actual service as jurors, either in comparison to the proportion of adult Negroes to white persons in Fulton County, or on the tax lists, or by some other method of comparison which might indicate the absence of discrimination on account of race in using the system to select juries; even if the system had been modified to eliminate a

clear means of identifying race. In both the Whitus and Vanleeward cases great stress was laid on the actual disparity shown to exist, i.e., the end result. In the Whitus case Mr. Justice Clark noted the failure of the State to come forward with evidence explaining the disparity, and in the Vanleeward case Chief Judge Tuttle condemned the system because of the result. It thus appears that any *system* which results in a *disparity* substantially as great as that shown to exist in those cases would probably be condemned by the Federal courts as discriminatory per se.

With nothing in the record to show the *result* reached by the system used by the jury commissioners, we are unable to apply the standards used in the Whitus and Vanleeward cases to the circumstances existing here. While the end result standing alone might not be determinative of the issue of discrimination, it is certainly a vital part of the overall record necessary to intelligently make such a determination.

It is therefore ordered that these cases be remanded to the trial court to allow the defendants to present evidence showing the result of the system used by the jury commission and on the basis of such additional evidentiary facts for the trial court to make a determination of whether such racial disparity existed as might subject the system to condemnation for such cause. See *Code* §§ 2-3708, 6-1610, 24-3901 (2).

■ The appeal in each of these cases being from the overruling of a motion for new trial after felony convictions, the enumeration of error in each case asserting the refusal of bail pending appeal is not directed to a ruling "affecting the judgment appealed from" (*Allen v. Rome Kraft Co.*, 114 Ga. App. 717, 718 (152 SE2d 618); *Aetna Life Ins. Co. v. Greene,* 116 Ga. App. 783, 784 (159 SE2d 87)), nor a ruling "which may affect the proceedings below" (*Code Ann.* § 6-701 (b)) in any subsequent trial. Accordingly, these enumerations fail to present any issue before this court requiring adjudication in the posture of the cases as presently before this court.

■ Headnote 4 requires no elaboration.

*Cases remanded for further proceedings not inconsistent with what is said in this opinion. Pannell and Deen, JJ., concur.*